All right, Mr. Duncan, when you're ready. While I say that I would disagree with the administrative law judge's assessment of his physical limitations, that issue is not raised in this particular case because even though I think the medical evidence is probably close enough, it would be an issue asking the court to re-weigh that. So we're focusing on the mental health issue. In this particular case, we have, and what I'm going to do is, in the brief I had, the first issue of the regular press was actually the second in the brief, but given the court's recent decision since the briefing of this case, in a hoax, I think it is relevant and poignant to point out the second issue first. And that's specifically the medical opinion rule under 20 CFR 404.2520C. In this particular case, we have multiple medical opinions that outline everything from cognitive evaluation, IQ tests, and the administrative law judge found all of the medical opinions on mental health unpersuasive. That includes the state agency assessment. So therefore, then, he had no medical opinion that he found persuasive, and that led to the second issue, which is whether there's support in the record for residual functional capacity assessment. And I start with hoax, simply because, since it's been decided that the court issued its decision last year, hoax versus fugacity at 74th edition 207. The court in that case noted that supportability is the degree to which a provider supports their opinion with relevant objective medical evidence and explanation. And then the second part of this consistency is the degree to which a provider's opinion is consistent with the other evidence. Now, the first part of this is that supportability is an explanation, and the court noted that in hoax, there was not any evidence or outline of the evidence on objective medical support for whether or not Mr. Coates needed an ambulatory device. The second part of that is the consistency factor. And in hoax, the court noted that there were multiple medical providers who all indicated about the same thing as far as the degree of Mr. Coates had issues that may have required an ambulatory device. Both points are noted in this particular case. They indicated we have multiple medical opinions. Joyce Weir-Brown, November 2001, did an evaluation. Larry Lang, May of 2019. Psychologist Rodney McCall, in 2020. And Tony Fowley, in 2020. There were third-party reports. That's one of the plaintiffs was the apologist, Sarah Beth Funding, a family friend, Dr. Gerald Heater, Mr. Bush, a professor of education, and Barbara Spaulder, a former teacher of Mr. Miller. The judge's opinion, and I'll start with Dr. Gowdy, since that's demonstrative of everything wrong with the AOJ's court findings. Dr. Gowdy's opinions are not fully consistent with the totality of the record. He never addressed the support. Dr. Gowdy indicated in his report that he reviewed the medical evidence. He reviewed the psychoeducational evaluation of Joyce Brown. He reviewed Dr. Lang's opinion. He reviewed the extensive testing of Dr. Provost McCall and the letters from Dr. Bush and Mr. Heater. None of that is addressed by the judge. It's not whether that does or does not support Dr. Gowdy's opinion. The AOJ never evaluated his mental status exam. Dr. Gowdy didn't perform that date. Mental status examination by many courts has been held to be an objective test. I mean, we're talking about mental health. It's not a situation where you're going to be able to just put a cup on an individual's arm and tell what exactly their mental health status is at that particular time. The AOJ never assessed the supportability of the opinion. These may be a repeatable battery for assessment of neuropsychological status. This is an evaluation.  It's available. It can be purchased through a real estate agency. It is used within the mental health field to determine. In that evaluation, for example, we found that Mr. Langer had a significant reduction in attention, 0.1. He had delayed memory, less than 0.1. Total scale was less than 0.1. And his immediate memory was less than 0.1. Now, these are significant because if Dr. Gowdy's opinion had been adopted, he would have met Listing 3.0 or actually 4.05 at Step 3 of the sequential process. That's a finding of disability as a matter of law. Regardless of that failure, the judge still would have had to look at Dr. Gowdy's opinion and assess it for what limitations were properly associated with it. In particular, when we're talking about what his findings were marked limitations in concentration persistence case, marked limitations in understanding the memory and carrying out instructions. We're talking about an individual that's probably going to require special supervision. So even at a sedentary level, that level of special supervision is going to be needed. It's going to have to be redirected, it's going to have to be explained. None of that has been addressed by the judge in this decision. Now, the judge makes findings. For example, he says he was able to maintain employment as a laborer in spite of the mental health issue. That finding fails to explain what all the medical opinions in this case show, which is that he specifically had a decline in his cognitive functioning among the times heart surgery was done. The fact that he worked before has no bearing necessarily on that. There's no rebuttal or no evidence to reflect that his condition had worsened. Now, you also talk about the fact that he's claiming that there was no relationship on subjective statements from Mr. Langer. Well, of course there's subjective statements in the mental health case. Counsel, I'm sorry. When you say there was no evidence to rebut it, I just actually had one very specific question about the ALJ's opinion. The state agency consultants, I think it's Roman and Hersey, I mean, their assessment would rebut it. But is it your view that the ALJ is saying I find their assessments unpersuasive? Correct. Okay, but see, so this is my question. What it says is that their physical assessments are found unpersuasive. So, but do you think, is there somewhere else where the ALJ says also their mental impairment assessments were unpersuasive? There's not. You can either do it one of two ways. Either the judge completely ignored them, which means that that issue is waived in the decision. So if waiver applies to employment, the judge doesn't address it, it should be considered waived. Or he just implied that by finding the state agency assessments in that paragraph both physical and mental. Well, I don't see how you can read something that says physical as implying not just physical, also mental. But your first point is, okay, so it doesn't imply that. I would say that. He just never addressed it. But you say he never addressed it, and I'm wondering why don't we think it was addressed when the ALJ rejects the contention that, you know, there's been a substantial decline cognitively, and that would be consistent with the assessments of Roman and Hersey, right? Well, yes. He said that neither doctor ever had an opportunity to review any of the reports or medical evidence assessed by Dr. Gowdy or by Mr. Lang or by Dr. McCullough. So it's alluded to just how much assessment or knowledge they had of the entire record, since a lot of it was developed after the state agency's assessment reconsideration. So it's a big gap in this record. Ultimately, though, the problem that comes in is even if you do that, where's the assessment of showing that their opinions are consistent or inconsistent with the findings of any of these other medical opinions? Ultimately, in hopes that work said that you have to assess the consistency of medical opinions, there's no attempt to assess the consistency of the state agency factors against any of the other medical opinions in this record, and that's what the regulation points out specifically. I mean, I can look at the Federal Registry, which was the assessment of this particular paper regulation, and it talks specifically about needing to articulate the ground when you're making these assessments, and I believe I cited the Federal Registry in my brief that it's not here, and we're stuck with a very mild aspect of this as far as what exactly is there, as far as evidence to support his conclusion. All we have are statements of him, you know, saying that he was working, saying that there was a mental status exam that showed an improvement. Well, a mental status examination is done by a neurologist. In the context of him complaining about a neurological problem, it was decontextualized, and really, you know, it's not the same as having a mental health expert do a mental status examination. Other than those three points, there's very little evidence to support the ALJ's assessment of either supportability or credibility of the medical opinions. And then I think I'm over time, but I'm going to hand it off. I'll save it for the follow-up of most of the questions. Thank you, Mr. Duncan. Mr. Summers? Thank you, Your Honors. May it please the Court. My name is David Summers. I'm a Special Assistant United States Attorney appearing on behalf of the Commissioner of Social Security. This case is about the finder of fact in Mr. Linger's disability claim, the ALJ, agreeing that he had a severe intellectual disorder, but that those challenges did not foreclose all manner of substantial gainful activity. Instead, the ALJ found that working remained a possibility for Mr. Linger, a young man still in his 30s, but not just any type of work. The ALJ found the work could not be complex, nothing more than simple tasks and decisions. The tasks would also have to be routine and repetitive. The pace could not be fast or externally set by an assembly line or piecemeal quota. The need to interact with others would need to be limited. It could only do that occasionally. And perhaps most importantly, any change in work responsibilities would need to be explained ahead of time and implemented gradually. The substantial evidence standard that applies here presents the question, does this finding qualify as one of potentially many reasonable possibilities presented by this record? Was it within the ALJ's zone of choice in light of the evidence? If we follow the path the ALJ took through the evidence, the answer is yes. Now, the start for that path is that Mr. Linger had the capacity to handle this type of simple work in the past. He successfully worked as a shuttle driver, a Walmart stocker, and as a laborer. And this starting point is not in dispute. Mr. Linger admits that he can perform simple work, you know, in his briefing and in an argument here. And with that as the starting place, the ALJ's decision then points to the substantial evidence that did not show a material worsening in Mr. Linger's baseline functioning. There are at least three lines of evidence that light the path here. The first was Mr. Linger's treatment history. As the ALJ discussed, Linger's doctors observed that he was generally doing well after his early 2019 heart surgery, and his doctors did not observe a decline in cognition or intellectual functioning. It never appeared as a problem. The second line of evidence were clinical observations made by medical professionals, including the independent psychologist, Mr. Legg, and a treating neurosurgeon, Dr. Batia. The ALJ cites these at 81 in the decision, or 81 in the joint appendix in the decision, and references them again later when discussing the opinion evidence. Mr. Legg observed that Linger's concentration was only mildly deficient, and his thought process, thought content, insight, judgment, memory, persistence, and pace in social functioning were within normal limits. Dr. Batia, similarly, did a neurosurgical evaluation that showed normal fund of knowledge, orientation, memory, attention span, and concentration. And the record has other examples, too. Dr. Saba, Mr. Linger's cardiologist, noted a negative finding in terms of memory loss and forgetfulness at 443 of the transcript, or of the joint appendix, excuse me. There was a reference to no memory loss made at a cardiac ultrasound. That's at 848. And Dr. Salmon, Mr. Linger's cardiac surgeon, documented normal memory in his treatment notes, and that's at 477. And then the third line of evidence that sort of layers on top of these two is Mr. Linger's activities. There was evidence here that Mr. Linger engaged in simple tasks in his daily life, some basic yard maintenance, weed eating, cutting brush. He could drive a car, he could handle household chores, and he independently cared for his young preschool-aged daughter. He lived with his mother, and he needed help, certainly, caring for her in terms of... Driving a car was limited to about three miles two or three times a week to the same location and back. That's not quite generally being able to drive, is it? I mean, it's an ability to drive that I think... Yeah, he can operate a car with a consistent path back and forth, but that's a bit stressed to say he drives on this record. Is that right? I mean, there are other cars on the road. You're getting in the car, you're driving. I mean, Mr. Linger's mother says that she leaves Mr. Linger home with his daughter, and he can drive her. This is a 388 of the record where she's explaining that he needs help, certainly, of course, and DLJ's findings reflect that. This is a very limited, narrow range of simple work that isn't... Largely isn't disagreeing with what Mr. Linger said he struggled with. Well, when Mr. Linger testified, he said, you know, I struggled with when they had to do multiple tasks across the job site and move around different places, and the ALJ's response there is... Well, in terms of sedentary work, doesn't it say at GCS2 work that's fast-paced procedures such as assembly line work and mill quotas? Aren't you supposed to avoid those kind of jobs? Exactly. But do you know of anybody who sort... Have you sorting boats as one of them? You say you could do... They're going to let you be able to sort one boat in 20 minutes, another one... That is a pace job that requires... At the end of the day, eight hours, you say, how many have you got? Well, I've only done 10 boats, and everybody else is doing 500 in eight hours. I mean, that seems to be contrary to what you say the limitation is. I never heard of a boat sorting, I guess, that exists, but it's like taking a boat and you've got to put it in this bin and that bin. Is that right? Because it's your case, so you're telling him what universe of jobs there are. There are 15,000 of those jobs where you can sort boats. Are you going to just sort one at a time, and if you get frustrated, you can take an hour to put the next one in? How many... That's exactly what it says. It says, avoid assembly quarters and meal-type things and fast pace. That's exactly... You're telling him that he has to do what you said that he can't do. But what the ALJ is finding there is explaining that it's the type of pace that you don't necessarily have to slow up anybody else on the job. Oh, really? That's what the ALJ is conveying there. The ALJ, do they have any experience with seeing somebody sorting boats all day? What the ALJ does is the ALJ presented that. It presented that, but there's no evidence of it. You know, you ever worked at a factory? No. I have. And, you know, in tobacco, when I was dealing with cigarettes, it was thousands of cigarettes in an eight-hour period, back and forth. I never seen anybody work on the job where they could just... That's the whole... His IQ is, what, 60, right? He has a very low IQ. It looks like the ALJ didn't put any stock in the people who observed him on his last job. He said he got frustrated, it was difficult for him. He said he couldn't understand. That's important in terms of his last job. There's no analysis of that at all. The ALJ's analysis of that is going through and talking about Dr. Gowdy and Mr. McCullough because Dr. McCowdy and Mr. McCullough rely on them, and as the district court explained in its decision, the ALJ's, you know, as the district court said in its decision, the ALJ references that co-worker reference when talking about Dr. Gowdy. It gave little, no account to it. I mean, I think the ALJ does give account to it. The ALJ was not persuaded, in light of the other evidence, that that suggested a complete inability... In law, don't we call it the best evidence? Someone who saw you do your last job, a person who has no stake in here at all, and saying, look, I saw him. I saw his frustration. I saw it was difficult for him, which is consistent with his intellectual limitations. And then you say he shouldn't have something that's fast-paced, shouldn't be assembly, yet you say he can sort votes. It doesn't make a lot of sense in terms of dealing with a person who, you know, he tried to work, that kind of thing. There's no evidence of malingering here. You didn't give him a malingering scale, like he's faking it. It just seems inconsistent based on this record that you have. I think the ALJ's decision shows that the ALJ was grappling with that exact thing. And the ALJ's analysis there is, you know, I'm looking at, you know, his ability to work in the past. That's the starting place. And then I look at how his treatment progressed. Because the evidence that Mr. Linger put forward is that, you know, his physical condition declined, and because of that is the reason for his cognitive decline. And so then the ALJ looks at, okay, those treatment records, they don't necessarily show that. He has Mr. Legg's examination, where Mr. Legg, you know, notes the incredibly low IQ. You know, it's a very low IQ score for sure. But also there's evidence of adaptive functioning, of the ability to overcome that and be able to have mildly deficient in concentration with, you know, a pace finding of within normal limits from Mr. Legg. You know, that's an important, you know, important aspect of this that suggests that maybe the pace isn't so severe as Your Honor suggested there in terms of, you know, sorting bolts or whatever the activities that are found there. And then you layer on top of that, you know, the evidence about his activities, which wasn't just driving. You know, it was also, you know, handling, you know, there's evidence of him working and handling simple maintenance activities, him caring for his daughter is very, you know, very significant. She's four years old. He says in his testimony was that he did, you know, he did it by himself, you know, with just a little bit of help. And that, you know, is a significant thing that Gail is thinking about. Grandmom was in the home, right? But she worked. She worked full time, but she left him at home with his daughter. You'd be surprised how much mom and grandmom and dad prepare for things, even when they're gone, having to play this is ready here, the clothes are set out, all those things like that, you know. But there's nothing in the record at all where you even consider that as just, like you said, driving. You said driving. And when you look at that, it's not quite driving. But I just don't know. I mean, do you know what the bolt, I thought that was fascinating. What is bolt separation or? I believe you're referring to the final assembler job. Yeah. By the vocational expert. Yeah.  Sorting bolts. What is that? The ALJ relies on the vocational expert there to identify the work. The ALJ ever been there and seen these jobs, these assigning people that they can do? I mean, the ALJ relies on the vocational expert for that. And there hasn't been any challenge. There was no challenge at the, before the ALJ, there was no challenge. And that, to be clear, vocational expert is just giving examples. The vocational expert's testimony is that I'm giving examples of jobs that he could perform. And then he chose that one. And there was no objection there. There was nothing to challenge that. And then it is never one I challenge in district court, the idea that this range of work would then be, present with a significant number of jobs. As you said, it's 10,000, 15,000, 25,000. It's not a huge number of jobs. But the disability program is set up this way. This is the way Congress set it up. And these 15,000 jobs, is that United States and nationwide? Yes. So we don't know how many might be in the state he lived in. Not specifically. So he may have to move to California or to Minnesota or whatever. And that's part of the disability program that Congress has set up. It doesn't let that be taken into account, the idea that you would have to move for the job. And then I'd also add that. Nuances of human experience are irrelevant. It's. I don't want to say yes to that. I know you don't. Because you know it doesn't. All right. That's all the questions I have. Go ahead. I just want to just also add that, you know, the ALJ's decision does reflect consideration of doctors Roman and Hersey, the state agencies. You know, there is a reference. Excuse me. You know, on the. It's 83 of the transcript at the top of the page where, you know, the ALJ says, like, he is finding Mr. Linger somewhat more mentally limited than those doctors did. And he's doing that, but also agreeing with them that he's nonetheless capable of gainful employment, as will be discussed below. So the ALJ is then sort of referencing the later discussion, particularly when talking about Dr. McCullough, where the ALJ is lining up these three lines of evidence that I've been discussing and saying, you know, here's where I see, you know, that this is the right result for Mr. Linger. Can I ask you a question? Because it's sort of an interesting case because a big part of the claim, the physical limitations, is not in front of us. But the ALJ says sort of, I'm kind of in between the state and the claimant. And the RFC I am coming up with is more restrictive than the one that the agency was using. And is that happening over on the physical side? Let me. It doesn't. If you have to look it up, it doesn't matter. I was just trying to. It is hard. I don't remember it off the top of my head, but I suspect that the state agency consultants perhaps have found light work and not center, which is more physically taxing. So that was really sort of where it was going. And then I'll just close by just saying that, again, like the standard of review here is deferential. And we are talking about one of the many reasonable possibilities, the zone of choice, you know, could a reasonable mind possibly come to this result? And that is where I think the ALJ's decision should be affirmed in this case. Thank you. Just one question before you go. What about it seemed that clearly that the ALJ discounted Dr. McCullough and Dr. Gowdy or Mr. McCullough and Dr. Gowdy because there was no, it was subjective and not physical. Is that a fair assessment for someone who you're dealing with emotional questions and intellectual capacity? Did you expect to find some physical type thing? In terms of Dr. Gowdy's, there is a reference at the end of the ALJ. That was the justification for not finding them persuasive was that it relied more on subjective evidence to support their conclusions. Yes, subjective evidence. And there's a reference to. Wouldn't you expect, for example, if someone saw a psychiatrist for 10 years that you might find over 10 years they've never said anything about whether or not they could lift 10 pounds or not? Because that's not their field. That's not what they're looking at. I'm sorry. I'm not sure. I'm not sure I'm answering the question. Never mind. Why would you expect to have something other than subjective type things? Well, I mean, Dr. Gowdy's particularly, and as my colleague on the other side said, in this scenario where we're talking about intellectual functioning, there is going to be some objective presentation there. And so the ALJ is first focused on that. But also Dr. Gowdy's, one of Dr. Gowdy's main statements is that he told me that he has this decline and that Dr. Gowdy doesn't have the full, he doesn't have the treatment records. So he's not given those. So he doesn't see those. So he doesn't know sort of all of the ins and outs of how that treatment progression worked. So then the reliance on the subjective statements there becomes just a little less persuasive for the ALJ. But the main focus of the ALJ's analysis here, this turned on the consistency factor. Council referenced the supportability factor. And the ALJ talks, and there's Dr. Gowdy's is a full single space page in this decision. It's discussing Dr. Gowdy and then a half page for Dr. McCullough. So the ALJ is focused on what these doctors, grappling with what these doctors said. But just finds these other pieces of evidence to not carry the day. And because a reasonable mind could do that, we ask that the decision be affirmed. All right. Thank you. Mr. Duncan, you have some time reserved. Thank you, Your Honor. Let me start by saying Dr. Gowdy didn't review the medical evidence. The first page of his report says that he reviewed the record, the records provided or the records available. It also says that he reviewed all of the other medical opinions. Now, we talked about Mr. Lee's opinion. Let me just point in the middle of the opinion or two or that opinion. Dr. Gowdy should be within normal limits. But you can recall only three or four words given to him prior to his report. So, in other words, he's forgetting a simple word within five minutes. And that is consistent with what we're talking about. We have an IQ test of 60 full scale. We have a cognitive loss evidence by the fact that he has 55 processes. And we have a judge who tries to say, well, he's only limited to simple work involving no fast-paced production, no definition of what is fast-paced production, no idea of exactly how the judge says no fast-paced production applies to this particular case, to Mr. Linder, or to the findings of this medical opinion. I'm going to go back again to Oakes, which this court passed and which is really probably the only major opinion on the new evidence standard. I mean, we used to have a lot more availability because we relied on treating source statements. The new evidence standard is supposed to address modern techniques. What it's doing, in essence, is giving judges more authority. And without having an oversight requirement to actually show that they consider all of the relevant evidence and explain why specifically that evidence does not support a medical opinion. It runs counter to what the administration said or what the agency said in the federal registry, as far as what the responsibilities of the ALJ are, and prevents us from providing oversight. Because otherwise, ALJs are given wide, very wide discretion. And in fact, ALJs are so familiar with how to frame hypothetical questions, that it can give the illusion that they're addressing all of the claimants' limitations when they know what the answer is going to be, the vocational answer. We simply do not have any support for that. We have large, vast amounts of evidence, all in psychological testing. And none of that was assessed by the ALJ in this particular case to determine whether or not it supported Mr. McCullough or Mr. Gowdy's opinions. So we're kind of left with, well, it's not supported because he couldn't look. But what did he do for work? When you look at the testimony or statements, he sat around all day. He drove his dog. He occasionally got up and made some food once in a while. It's a very minimal amount. There's nothing in there that indicates those activities were quite full-time, sustained work. And unsubjective statements, as I've indicated, they're not. They're relying on the testing and the opinions of other medical experts, whoever assessed his case, as well as opinions and testimony from other individuals, who they found credible based upon the testing. That's ultimately the case. In this particular case, the limitation is that he cannot sustain competitive work in even the most simple, basic condition because the cognitive loss is evidenced by multiple medical opinions. Thank you, Your Honors, for your time and patience. All right. We're going to come down and greet counsel and then take a brief recess. And, Mr. Duncan, we're sorry we can't give you a real handshake, but know that virtually it is just as powerful and real. We'll come down. All right. Thank you.
judges: Roger L. Gregory, Pamela A. Harris, John A. Gibney Jr.